is quite litigious. He seems to show up a lot. Mr. Porta, correct? Correct, Your Honor. Very good. Would you like to reserve any time? I would. Five minutes, please. Five minutes, okay. Please proceed. May it please the Court, I represent the petitioner, Mr. Wu Wei. Your Honors, basically this is an immigration case that the Board of Immigration Appeals adopted and affirmed under Bourbono. They did include a tiny bit of analysis, but actually I would venture to say that we're looking at an I.J.'s decision here. This is an I.J.'s decision, if I may quote the I.J. that says, before he entered the decision on the record, says, is very frustrated with the entire process of immigration, which I can understand. But he does say all you have to do under Ninth Circuit precedent is tell the same story twice, and you get permanent resettlement in the United States. That is followed by the I.J. entering a decision. I submit to the Court that the I.J.'s decision is just, is wrong. There are several instances, and the crux, I believe, of the I.J.'s decision or what is probably most at issue before this Court are two items. One is the Petitioner's passport that he obtained, and two are the asylum officer's notes that were placed into the record. I'd like to begin with the passport. In the instant case, the Petitioner submitted a passport that he admitted from the get-go at all points in time that he purchased through a friend who introduced him to another friend. That passport is a public affairs passport. The I.J. discounted Petitioner's testimony basically because of a quote in the asylum profile which states that anybody that has a public affairs passport, which is almost like a diplomatic passport or something of a high-level official, really don't have a claim to asylum because they have to go through certain government channels to obtain that. However, that takes Petitioner's entire testimony out of context and is completely disingenuous to his plight. Petitioner testified that he obtained that passport by paying somebody. That passport was obtained through back channels. It's not legitimate. Therefore, that's not substantial evidence to support the finding that the passport isn't – can be used against him. Is there something in the record that indicates that the passport is illegitimate? Well, other than the Petitioner's testimony, the Petitioner on his asylum application, Your Honor, indicated that he used a bogus passport. He indicated at the asylum office that the passport – although I can't really make out the asylum officer's notes, which I will get into later, but it appears from the asylum officer's notes that the Petitioner off the bat basically said, look, this is my picture, but this is not – this is my name, but this is a different date of birth. And part of the reason that he did do that was he had – when he had spoken to his family about the passport, he had been told, look, if you tell them that you're from this province and that this is your name and date of birth, there's no way they're going to find out. So for this to work, you need to basically lie and tell them that this is where you're from and this is your date of birth, and that way it's basically going to come back untraced. Well, the passport was a valid passport, but it had the different date of birth and place of birth than the Petitioner actually had. Isn't that the situation? Correct. We get into this kind of amorphous metaphysical world of what is real and what is not. The passport, I believe, was issued by a lawful government agency. However, it was issued unlawfully because it contained incorrect information, and it was basically issued after the Petitioner paid a bribe. Yeah, but is there any explanation why it was this sort of higher-grade passport? No. There's no indication in the record whatsoever, other than the only thing I can suggest is that there are indications in the record that the person, the Petitioner knew somebody who knew somebody that knew somebody inside the passport agency, so they just went directly in. Now, why they chose a public affairs passport, I believe, is nowhere established in the record. It seems to me the essence of your client's claim is that he is a Christian. Correct. And yet he claims he attends church every day, every Sunday. He doesn't know the name of the pastor. He doesn't know the name of anybody in the congregation. Is that evidence that the IJ would be entitled to consider in terms of the credibility of his base claim? A couple of points on that. That was not really elaborated upon too much at the asylum during the testimony. The Petitioner did state that he didn't know. However, there's many a reason why that could be. Maybe he just went to church to pray in silence. He did say he was praying for his family members. There's no requirement that an avid churchgoer know everybody that's in his church, sit there and chat with everybody. Maybe it was just a pious man that decided to go to church and pray. You may indeed be considering the very postulate that you gave a moment ago, to consider what is real and what is not real. Perhaps. I don't want to necessarily take it there. The most important point, I think from a legal standpoint, this is not a material aspect of the Petitioner's claim. And as such, under this Court's precedent, is not a... I thought it was the basis of his claim. The fact of whether he practices in the United States is completely immaterial to the fact that he was detained, he was beaten. I understand that. But if he claims he's being persecuted because he's a Christian and there's no evidence other than his testimony as to what he did before, and then he comes here, if he's not really involved or if he presents evidence that at least would raise the question, is that not a legitimate consideration for the IJ? I believe not. It happened after the fact. It does not have any bearing. It does not go to the heart of his claim, the heart of his claim that he was persecuted while attending a house church. The basis of his claim is not whether he is social with the person sitting in the pew next to him at the church and whether he knows the pastor on a first-name basis. I respect that. I'm trying to understand why you think that that is not at least evidence of whatever value that the IJ can't consider. I believe it's something that the IJ can consider. I don't believe that that alone is sufficient to wipe out everything else that has happened. Let's assume that all the other basis of the IJ's decision are invalid, and I know this Court has precedent in Lee that says only one basis is required. Right. But that must be a legitimate, articulable basis, specific and cogent reasons. I don't believe that this is cogent enough. I don't believe it's specific enough. I don't believe it's real. What about that? Let's shift over then to his testimony about his detention. Initially, he was able to talk quite a bit about certain aspects of his confinement, and then he was able to supplement it grandly thereafter. Is that something that the IJ can consider in terms of the credibility of what was stated? Well, that leads me to my argument regarding the asylum officer's notes, Your Honor. Okay. In the instant matter, the asylum officer's notes are handwritten, extremely sloppy and very difficult to read. And I would commend I hope you're not going to say that to any judge of the Ninth Circuit, because all of our handwriting is really legible. Well, I'm not, but fortunately, Your Honors, don't write handwritten opinions and publish them in Westlaw that way, in the Federal Register, but we're the reporter. But what I am saying here is the asylum officer's notes are more detailed than what this Court has seen in the Singh case, for example. In the Singh case, it was just a short blurb of an asylum referral to the Court. However, in the instant matter, there's many, many, many procedural safeguards that I don't believe should be used to include those notes as a basis for comparison. One, there's no indication from the notes that those notes were read back to the applicant. There's no indication that he was ever asked if what he had said is accurate. They weren't provided to him until the time of the hearing. He basically gets them. And might I say that the counsel that was representing the petitioner at the Court has subsequently been disbarred and is no longer eligible to practice law, for whatever that's worth. But you're not making ineffective assistance? I'm not. I'm just kind of setting a backdrop as to how this all occurred. We have a counsel that was not, has been impugned several times, I believe he was published, they published a decision. If you're not going to argue ineffective assistance of counsel, I just assume you move on to the other points. Okay. There's no, the notes are very difficult to read, and it's very hard to establish that you're going to basically contradict someone's testimony with something that hasn't been read back, something that's very difficult to read, and to tell you the truth, I am still having difficulty reading those notes as we speak. I spent hours last night, and I still can't comprehend everything that's in there. He was never asked at the hearing, Your Honors, whether he was placed under oath. That's extremely important. I believe this Court and Singh used that as one of the criteria to determine that the assessment to refer was improper.  Again, the Singh case has a great discussion of why all these things are required, because it's, according to the regulations, an asylum interview is a non-adversarial proceeding. And having been through many myself, it's usually the type of proceeding where the attorney sits down in silence and listens to the asylum officer ask questions, and at the end sometimes officers will allow you to say something, but most of the time they don't. I don't believe that the asylum officer's notes in the instant case are sufficient. They're extremely difficult to read. You asked to reserve five minutes. Do you still want to do that, or do you want to proceed a little longer? I will proceed about one more minute. Okay. The only other arguments that I want to make before I go to rebuttal are other instances of credibility. The immigration judge views the fact that the petitioner had used lack of detail at the interview as a basis. That alone, the fact that you explain something more later I don't believe is sufficient, and this Court's precedent seems to indicate the same. He indicated at court he was prepared to go to court, and he gave thorough testimony. The fact there's really no inconsistency there. There's another argument that's been raised about his daily routine that he endured while he was in detention. The government's advancing that he should have had greater recollection back then and not now. I would submit that it's really anything that was said there is immaterial. It's a minor inconsistency. The major inconsistency, the most major of the inconsistencies there was about a half-hour difference as to the time that he woke up. Everything else is really not necessarily an inconsistency, but more of an explanation as to what's going as to what actually occurred during that time. Thank you all. Okay. You're going to reserve the balance of your time for rebuttal. Mr. Gensler. May it please the Court, Lyle Gensler for the government. This is a case about a number of inconsistencies and essentially about a question as to who this petitioner really is. When we combine all the inconsistencies and all the implausibilities of his testimony, the immigration judge's decision that he was not credible is amply supported by the record. And Petitioner has not shown, as is his burden, that the record would compel a reasonable fact finder to find to the contrary. The biggest issue here Mr. Gatter, your point is that the I.J. found the Petitioner to be incredible. If that finding is supported, the Petitioner loses. That is correct, Your Honor. So the thing we have to determine is whether the finding of incredibility by the I.J. was appropriate. Is that correct? Yes, Your Honor. You say that finding was inappropriate for what reason? We are saying it was appropriate. Was inappropriate. Oh, I'm sorry. Finding him incredible was appropriate. Yes, Your Honor. And we'd also hasten to add, just before it's forgotten, that if the Court disagrees with the government on this, it is the government's position that you would then have to remand the case pursuant to Ventura because the immigration judge made no determination as to whether it was past persecution or well-founded fear of persecution. To answer your question, we believe the finding was appropriate for several reasons. The first has to do with the passport itself. This was a very unusual passport, not the traditional one that one would come up with. It was basically a passport that only a journalist would get, somebody on official travel, very difficult to come by. There's been no explanation as to how this happened. But the explanation that we do have is very, very bizarre. Apparently, according to Mr. Wu, he had a friend of a friend, an acquaintance. He never really spells, you know, he had dinner with him once, that's all he says. He doesn't say how he would know this guy could get him a passport. In fact, he says the man was a clothing dealer. He's not a snakehead. There's no indication of smuggling. But apparently Mr. Wu, who at this point is under observation by the Chinese police because he has not been reporting, as he is supposed to, to the police station twice a month because of his involvement with the underground church, he is able to just evade the police, leave his home, travel across China into Inner Mongolia. There's no indication he's ever contacted anybody in Inner Mongolia before. He just travels there, meets with this acquaintance, somehow knows that he's going to have to have $5,000, I'm sorry, 5,000 yuan, which is approximately $600, and he just gives the guy that money, and then he gives him a photograph, travels back to his home, then six, I'm sorry, about a half month later, again evading the police who are watching for him, goes all the way back to Inner Mongolia and gets this special type of a passport and comes back. The passport has his own photograph in it, and it has his correct name. Where the difference is, allegedly, is that it says he's from Inner Mongolia, and it has a different birth date. The birth date is in question. Now, there is evidence. He's claiming he was born in February. The passport says he's born in September, which is a different birth date. He says, well, I had to do that, and my birth date is in February, and he has produced other documentation in the record to indicate it was in February. The problem with that is when he goes through his asylum application, he goes back and he changes it to September, the birth date that's on the actual passport. When the immigration judge tries to ascertain why would you do this, you had to swear that that was accurate, you're telling us it's not accurate, and yet you sign that it is, he's got no explanation. It just stands out there glaringly. What we have, and there's a lot of discussion on the record, is a passport that appears on its face to be valid. There's no question about it. Mr. Wu says, well, yes, but then it depends upon what your description or how you define valid. But it is an actual passport, an actual visa, that on its face appears to be valid. The question then becomes, did he travel here on a valid passport? That goes to the very heart of his claim. Now, the immigration judge and the government counsel on cross-examination kept trying to get this out, to find out, how did this happen? But there's never any more explanation than I don't know. I gave my friend 5,000 yuan, he did this for me. I never even went to the American consulate to get the visa. He produced everything. Why would he produce it? Is he a snakehead? No indication of that. Did he make a profit on this? No indication of that. Why would he risk this kind of problem? No indication on that. Why would not, with your correct picture, this why would not the Chinese have been able to detect, since they're looking for you, that you're not allowed to travel? Now, the only evidence that he had done something to cause the police to look for him was his testimony, is that correct? That is correct. And he claims that his wife sent him a letter saying that the police were still looking for him. So we have that. But there is no police report. There's no evidence of any of that other than his testimony, Your Honor. That is correct. So that's our first big problem with the testimony. I mean, it goes to the identity of the individual. Is he who he says he is? Did he really travel here on a false passport, or was this passport legitimately issued to him, and he just decided this is a better place to stay? Now, why would he do that? His sister's here. And when he meets with his sister, she explains asylum to him. Or at least that's the inference that's to be taken. This is a much better place to be. Well, how do I get asylum? She's not quite sure how she got asylum. It was either because of the Chinese birth control policy. Of course, she was a Christian. She had no idea which. She just kept wavering back and forth. But then he comes, all right, I'll be a Christian. Then we get to Your Honor's question about his going to church. There is no indication he knows the pastor. There's no indication he knows any of his parishioners. His sister gives different time frames for when he moved and attended a different church than he's claiming. And all he'll say is, I go and I pray in silence. This is a man who risked everything, according to his testimony, to leave China based on the strength of his beliefs. But he gets here and he doesn't follow through on those beliefs. I mean, not to the extent that he even knows who the pastor is. Now, the government is not saying that he should be great friends with the pastor. But if you're going to church every day, as he claims, there should be some indication at least you know who your pastor is. You've seen him. You can describe him. He's on some of the literature. He's giving the mass or he's delivering the sermons. There's just nothing on that. The next inconsistency that the IJ found has to do with the original testimony or the original statement to the asylum officer, which differs considerably from what he told the immigration judge. Now, it was sworn. We know that from the record at AR-195, where it specifically says he was sworn in. This is not the kind of a case where we do not have detailed notes. We do have detailed notes. These notes were presented to Petitioner and his counsel at the very least at the hearing itself. And Petitioner's counsel was given the opportunity to object to these, to demand that the asylum officer come in and testify. He did none of that. And maybe the reason is we don't know what the reason is, but the point is he hasn't done it. There's no allegation of ineffective assistance of counsel. And that's all that needs to be said about that. He did, in fact, talk about it. He never did anything further with it. The big problem with the asylum officer's notes, what was said, is not so much inconsistencies but lack of detail. There's almost no detail in what was said to the asylum officer other than I got up every morning at 6.30. He basically couldn't describe anything else that was going on. Whereas, when he was talking to the immigration judge, now a couple years later, he's got great detail. The immigration judge considers this along with the problem with his not going to church here where that just doesn't make sense, and the very big problem with the asylum applicant with, I'm sorry, the passport itself. He says, when I look at all this, I've got a major problem with your testimony. I just cannot find it as credible. He therefore finds it is not credible and denies the asylum application. Isn't it really very, very common to have rather skeletal reports of the interview and then much fuller testimony later? I mean, it does happen, Your Honor. There's no doubt about that. And that is one aspect of the case. But Petitioner did not, when he was asked about it, there was no claim, I was frightened, I didn't have an interpreter. My mind wasn't working. What had happened, what we have essentially here is someone who left China because he was traumatized by what happened to him allegedly during his detention because of his Christianity. He's not afraid to say, he's not afraid that they're going to send him back to China. At least he never says any of that. He gives a statement to the immigration officer, to the asylum officer, but he never mentions any of this stuff. And when he's given the chance during examination in front of the immigration judge, again, he doesn't give any reason why he was so vague to start with. And, again, that's only one of the three legs that this rests on, the other being the passport and the Christianity. When the immigration judge put all that together, he simply could not find that this individual was credible. Because he found him incredible, he denied him asylum. We asked the court to find that the record does not compel the contrary conclusion and that, therefore, it should affirm the immigration judge. But as I started off at the beginning, if this court finds to the contrary, then we'd ask that the case be remanded back to the Board of Immigration Appeals for a determination as to whether this actually was past persecution. Because we're not talking any major injuries, we're not talking any injuries at all. We're talking he was arrested for doing something that was, right or wrong, illegal in China, and he didn't get arrested again. He complied with the statute, he prayed at home, and then he just left China. All that being said, we would need to go back to the BIA if this Court deems his testimony to be credible for a finding of whether he has a well-founded fear of persecution. Subject to your remaining questions, Your Honors, that would conclude my argument. Thank you, Mr. Densner. Mr. Porta, do you want to use the remainder of your time or a portion thereof? Thank you, Your Honor. One quick point with regards to the asylum application. What appears to have happened in the record is that for some reason the asylum officer changed the date nearly on the Petitioner's application for asylum, the birth date. The notes that are the part of the notes that are legible with regards to the date of birth indicate that the date of birth was incorrect on the passport. The Petitioner's declaration, which has not been changed, indicates that his date of birth is what it is. The remaining documents that the Petitioner submitted indicate what his date of birth is. His sister, who came to court and testified on his behalf, indicated that that's his date of birth. I don't really believe identity is as much of an issue as is I understand the government's concern on how somebody can obtain a public affairs passport. That's fine. But if somebody works inside an office, there are corrupt individuals in this world and there are corrupt individuals that will accept a bribe. And maybe part of the court is shocked. Well, exactly. So that's basically my point. I don't want to go on with that. The other issue is with regards to the asylum officer's notes. I believe that argument is properly before this Court. It was raised at the Board. The Board dealt with it. And therefore, under this Court's precedent, that argument is exhausted. I don't think that there are sufficient indicia of reliability to rely upon the asylum officer's notes. And with regards to past persecution, I don't think it cuts. Clearly, the BIA's decision doesn't necessarily specify. It does specify that they didn't, that he didn't meet his burden of proof. That's intertwined with the credibility finding. However, in the IJ's decision, similarly, he did say that he was denying credibility, but he did say that the Petitioner did not establish past persecution. I would argue that this is a little bit different than what Ventura requires. He was hit with a baton. He was hit with a baton in the neck, which caused him to faint. That's just no minor issue. There's no minor harm that occurred to him. He was detained for seven days. He was beaten up. I think that's pretty egregious and something that under this Court's precedent has qualified people for past persecution. Does the Court have any questions regarding any of the remaining issues? I don't think so. Thank you, Mr. Porta. Thank you both for your presentation. The case of Wu v. Mukasey is submitted. And we will now hear argument in James River Insurance Company v. Schenck. I believe Mr. Plitt is first. Mr. Plitt, do you want to reserve any time? I'd like to reserve five minutes. Five minutes, okay. Your Honors, we believe that Judge Martone erred when he granted summary judgment on the insurance company's motion.
judges: Canby, Thompson, Smith